# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1421V

| | |
|---|---|
| KIMBERLY WILCOX,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: September 10, 2025 |

*Jonathan Joseph Svitak*, Shannon Law Group, P.C., Woodridge, IL, *for Petitioner.*

*Jamica Marie Littles*, U.S. Department of Justice, Washington, DC, *for Respondent.*

### DECISION AWARDING DAMAGES[1]

On June 2, 2021, Kimberly Wilcox filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccine received on September 17, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Respondent conceded entitlement in July 2024, but the parties could not agree on damages – specifically past pain and suffering – and have submitted that issue for my

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

resolution. Brief filed Jan. 4, 2025 (ECF No. 50); Response filed Feb. 26, 2025 (ECF No. 52); Reply filed Mar. 28, 2025 (ECF No. 53). The matter is ripe for adjudication.

**For the following reasons, I find that Petitioner is entitled to past pain and suffering damages of $117,500.00.**

## I. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II. Evidence

Upon receiving the at-issue vaccine in her left arm on September 17, 2020 (Ex. 6 at 10), Petitioner was 54 years old, with no recent history of left shoulder pain or dysfunction. *See generally* Ex. 6 at 1 – 60. She had been prescribed Naproxen for low back pain, but she could not bear the costs of physical therapy ("PT"). Ex. 6 at 45, 58, 70.

Eleven days post-vaccination, on September 28, 2020, Petitioner returned to her primary care physician ("PCP") complaining of post-vaccination left shoulder pain. Ex. 6 at 60. The pain was "rather constant, throbbing sometimes… not much relieved with Naproxen." *Id.* On physical examination, her shoulder was tender, with limited range of motion ("ROM") and positive impingement signs. *Id.* at 63. The PCP tentatively diagnosed

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

rotator cuff tendinopathy, to be managed with Naproxen, over-the-counter Tylenol, rest, and formal PT (which Petitioner declined). *Id.* at 69.

At an October 1, 2020 orthopedics initial consult, Petitioner reported that her left shoulder had "shooting pain at times, constant dull ache, [and] limited ROM" with no relief from Naproxen.[4] Ex. 3 at 38, 42. An exam found tenderness, "restricted and painful" ROM, and a positive painful arc at the rotator cuff. *Id.* at 43. An x-ray's findings were unremarkable. *Id.* Opining that Petitioner's flu vaccination had likely "irritated" her shoulder resulting in disuse and stiffness, the orthopedics physician's assistant ("PA") assessed impingement syndrome and adhesive capsulitis, administered a steroid injection to "help with ROM improvement," and provided a home exercise program ("HEP"). *Id.* at 43-44.

At a December 2, 2020 orthopedics follow-up appointment, Petitioner reported that her shoulder pain had "returned about 2 weeks ago" (thereby implying about six weeks of pain relief from the steroid injection). Ex. 3 at 28. Petitioner also complained of weakness and limited ROM. *Id.* An exam found "full" ROM but pain on abduction and external rotation, and positive painful arc and Hawkins tests. *Id.* at 29. Opining that the injury had been "unresponsive" to the steroid injection and HEP, the orthopedics PA ordered an MRI to assess for a rotator cuff tear. *Id.* at 30.

The December 9, 2020 left shoulder MRI found mild infraspinatus tendinosis; mild strain of the musculotendinous junction; mild subacromial/subdeltoid bursitis; mild AC joint arthritis; and a "lobulated serpiginous foci" in the supraclavicular and peri-clavicular fat. Ex. 3 at 26; *see also id.* at 20 (Dec. 17, 2020 chest x-ray confirming that this "foci" was a supraclavicular arteriovenous malformation ("AVM")); *but see* Ex. 2 at 5, 29 (vascular surgeon's evaluation in February – March 2021, and conclusion that the AVM was "artifact," and there was no evidence of thoracic outlet syndrome or other vascular condition).

On December 11, 2020, Petitioner reported ongoing "sharp pain with lifting and throbbing" at her shoulder, and the orthopedics PA administered a second steroid injection. Ex. 3 at 22-24.

In late March 2021, Petitioner notified the orthopedics PA that her "pain ha[d] started again" (again implying temporary relief from the recent steroid injection), and she requested a referral to formal PT. Ex. 3 at 12 – 13. At the March 30, 2021 PT initial

---

[4] Of note, Petitioner's Brief at 8 states that her treatment efforts included Meloxicam – but the undersigned did not find evidence of that prescription. Petitioner may have intended to refer to her usage of the preexisting prescription for Naproxen.

3

evaluation, Petitioner's chief complaints were with housework, sleeping, lifting, reaching behind her back and overhead. Ex. 3 at 9. The exam found painful and limited ROM (*active* flexion 160 degrees and abduction 130 degrees; *passive* flexion and abduction 170 degrees; external rotation 50 degrees; horizontal adduction 80 degrees), 3+/5 strength; severe difficulty reaching overhead; and abnormal findings on numerous tests (apprehension, Hawkins-Kennedy, Neer's, etc.). *Id.* at 10. The therapist recommended formal sessions twice a week for eight weeks – but noted: "POC [plan of care] may be limited by pt's reported financial difficulties." *Id.* at 11. Afterwards the PT treatment plan was seemingly approved by the orthopedics PA and the insurance plan, *id.* at 6 – 7, but on April 17, 2021, the physical therapy clinic recorded they had been "unable to contact patient after 3 attempts," *id.* at 5.

At a May 5, 2021 orthopedics follow-up, Petitioner reported: "[P]ain all the time to her shoulder… at night she cannot sleep due to the pain… rate[d] 4/10… attending therapy twice a week." Ex. 3 at 2; *but see id.* at 5 (indicating that Petitioner was not attending formal PT, and she could not be reached by the clinic). The orthopedics PA's exam confirmed an ongoing injury, for which she administered a third steroid injection and recommended Petitioner that "continu[e] with HEP and PT" before potentially resorting to arthroscopic surgery. Ex. 3 at 4.

After a nine-month gap in medical record documentation (for any subject), on February 7, 2022, Petitioner was evaluated by an orthopedic surgeon. Ex. 8 at 18.[5] Petitioner reported a chief complaint of left shoulder pain that was "chronic… started more than 1 year ago… no history of extremity trauma… occurs constantly… unchanged… aching… 9/10… severe… inability to bear weight and limited range of motion… aggravated by lying down and activity… NSAIDs and movement… provided no relief." *Id.* Physical exam of the left shoulder found tenderness on palpation; full ROM with pain overhead; 5/5 strength; and positive drop arm, Speed's, O'Brien's, Hawkin's and resisted external rotation tests. *Id.* at 20 – 21. The orthopedic surgeon assessed Petitioner with biceps tendinitis and bursitis, which conditions had "failed conservative management" despite "temporary relief" from injections, and warranted surgical intervention. *Id.* at 21. Two days later, upon clearing Petitioner for that surgery, the PCP recorded that she had been "doing well except for her left shoulder pain." Ex. 6 at 93.

On February 24, 2022, Petitioner underwent general anesthesia and open surgery – specifically consisting of an open rotator cuff debridement; biceps tenodesis; subacromial decompression with coraco-acromial ligament release; bone marrow

---

[5] The February 7, 2022 orthopedics record (Ex. 8 at 18) provides that Petitioner had been referred by her PCP, and that this was a "F/U" [follow-up] visit. However, no additional records have been filed.

aspirate harvest; and subacromial injection with autologous progenitor cells. Additionally, a "finger sweep of the cuff revealed significant adhesions which were broken up." The post-operative diagnose were left rotator cuff tendinitis; biceps tenosynovitis; subacromial bursitis; and impingement syndrome. Ex. 8 at 34 – 35. That same day, Petitioner was discharged home with prescriptions for clindamycin and hydrocodone-acetaminophen. *Id.* at 38. No further orthopedic records have been filed.

Upon starting post-operative PT on March 31, 2022, Petitioner reported that her left shoulder injury had begun with a flu shot 1.5 years ago. Ex. 7 at 35. Her pain was currently 2/10 and ranged from 1-9/10 (but no current pain medications were documented). *Id.* Her ROM included 74 degrees active/ 89 degrees passive flexion, and 59 degrees active/ 64 degrees passive abduction. *Id.* at 36. Her strength was 3+/5 and painful. *Id.* Petitioner was noted to be back at work (as a landscape designer, which included driving and "computer work") with difficulty with almost all activities involving her left arm. Ex. 7 at 36-37; *see also id.* at 54 (upper extremity functional index with a score of 34/80 – with a full score representing no difficulties). The physical therapist planned formal sessions twice a week for eight weeks, plus a HEP. *Id.* at 37, 34.

Petitioner reported 0/10 pain prior to, and 4/10 pain after, her second formal PT session on April 13, 2022. Ex. 7 at 19. She was "ahead of schedule" in her recovery, and received an "upgraded" HEP on that date. *Id.* at 20.

At a third and final post-operative PT session on April 20, 2022, Petitioner reported feeling "fine," doing most of her exercises, and hurting upon bringing her arm towards her stomach. Ex. 7 at 5. She tolerated additional exercises well; the record does not include objective exam findings. *Id.* at 5-7. After Petitioner failed to return, her PT chart was closed five months later. Ex. 7 at 7; *see also* Ex. 6 at 101-115 (PCP records not referencing the shoulder, from August and November 2022).

The only other item of evidence offered relevant to the present determination is Petitioner's statement sworn under penalty of perjury on May 3, 2021. Ex. 1.[6] She describes in it residing with her fiancée and working as a landscape and pool designer. *Id.* at ¶¶ 2-3. In recounting her SIRVA, Petitioner states that she avoided in-person medical treatment due to COVID-19 concerns, and that she attempted to alleviate her pain with home remedies. *Id.* at ¶¶ 19 – 20. She reported pain of 2/10 "at best," 4-6/10 typically, and sometimes flaring up to 10/10. *Id.* at ¶ 21. The pain made it difficult to perform activities of daily living, sleep, and hobbies including crocheting. *Id.* at ¶ 22. Of

---

[6] Because Petitioner's statement at Ex. 1 is not notarized, it is not properly termed an affidavit. But it is entitled to "like force and effect" pursuant to 28 U.S.C.A. § 1746.

5

note, Petitioner prepared this declaration two days before receiving her third steroid injection (on May 5, 2021) so it does not address her subsequent treatment gap, surgery, and recovery.

### III. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the evidence establishes that Kimberly Wilcox's SIRVA involved moderately-significant initial pain which was not alleviated by Naproxen (previously prescribed for her chronic back pain), prompting formal medical evaluation just 11 days post-vaccination. Petitioner characterized the initial pain as significant and constant. She also displayed ROM losses and impingement within the first two months, and persisting over time.

There is also medical record evidence corroborating Petitioner's conclusion that she could not afford formal PT – for either her preexisting back pain or her SIRVA. The documented financial concerns help to explain Petitioner's repeated attempts at home exercise, and the absence of formal PT from the record.

The gaps in other treatment of the shoulder are also partially explained. In early 2021, orthopedists temporarily deferred care for Petitioner pending evaluation by a vascular surgeon – who ruled out potential alternative explanations for Petitioner's shoulder complaints. There is also evidence that each of the three steroid injections – in October 2020, December 2020, and May 2021 – relieved Petitioner's pain temporarily. The longest treatment gap running from May 2021 – February 2022 may be explained by a combination of steroid injection pain relief, plus Petitioner's desire to postpone the only other treatment option offered – surgical intervention (although the gap in medical records, and lack of other evidence from Petitioner or supporting witnesses, also suggests a somewhat more tolerable injury than the "10/10" pain she reported upon returning to the orthopedist in February 2022).

The eventual surgical intervention on Petitioner's shoulder also demonstrates an ongoing severe injury - given that the orthopedists had concluded that less invasive treatment efforts had failed. The surgery was also open and fairly extensive (not merely manipulation, or arthroscopic procedures), requiring general (not local) anesthesia.

Petitioner's surgical intervention was fortunately successful, as evidenced by her very swift recovery with just three post-operative PT sessions, leading to the end of formal treatment on April 20, 2022 – roughly nineteen (19) months post-vaccination. And Petitioner has not alleged unique impacts on employment (which involves driving and computer work) or personal life (e.g., any obligations to dependent family members) which might have enhanced pain and suffering. Overall, my instinct is to award close to the $100,000.00 baseline for past pain and suffering in SIRVA surgery cases here – and I appreciate that both parties are somewhat close to that figure.

Respondent proposes just $93,000.00, arguing that Ms. Wilcox's past pain and suffering was comparable, or slightly less significant, than that seen in *Hunt.* Response at 10-11.[7] On reply while seeking to distinguish *Hunt*, Petitioner inaccurately states that she herself only received "two weeks of relief" from the first steroid injection. Reply at 1-2. But Petitioner's medical records reflect that the injection was administered on October 1, 2020 (Ex. 3 at 38-44), and the pain "returned about two weeks" *prior* to her orthopedics follow-up appointment on December 2, 2020 (Ex. 3 at 28) – meaning that the first steroid injection was effective for *six weeks. Accord* Ex. 3 at 22-24, 12-13 (suggesting similar relief from the second steroid injection).

Otherwise, however, the record shows that Petitioner began treating her SIRVA more promptly (with the preexisting prescription for Naproxen, and the first evaluation at the 11-day mark, compared to 18 days in the *Hunt* case). Moreover, her financial concerns help to explain the lack of formal PT prior to surgery; her surgery was more invasive (the surgery in *Hunt* was arthroscopic); and the same number of steroid injections were relevant (as the *Hunt* petitioner's fourth steroid injection, after a significant treatment gap, was not factored into the SIRVA damages award). I recognize Respondent's (repeated) impulse to cite to *Hunt* in favor of a lower award, but that case is ultimately not instructive here.[8]

---

[7] Citing *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering).

[8] Respondent's citation to *Shelton v. Sec'y of Health & Hum. Servs.*, No.19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021 ($97,500.00), in the Response at 9, is even less helpful – particularly because of the *Shelton* petitioner's *five-month* initial treatment delay, which heavily influenced then-Chief Special Master Dorsey's valuation of the case.

7

Another one of Respondent's cited cases, *Moore*, is more helpful. Response at 9.[9] The similarities include the initial medical documentation of a shoulder injury (10 days post-vaccination in *Moore*, compared to 11 days here); somewhat unexplained treatment gaps (an early four-month gap in *Moore*, and the later nine-month gap not fully explained by a steroid injection here); a good response to surgery; and overall duration of injury (15 months in *Moore*, 19 months here). The *Moore* petitioner's low pain ratings and just one steroid injection, but more extensive PT, seems roughly comparable to Ms. Wilcox's three steroid injections and explanation that PT was financially burdensome.

Petitioner also identified some parallels with *Collado* – specifically the prompt documentation (14 days post-vaccination in *Collado*, 11 days here); high pain ratings; financial concerns explaining the deferral of formal PT; and "extensive and invasive surgery." Brief at 10 – 11.[10] Respondent accurately notes that *Collado* concerned a single mother who relied on her ex-sister-in-law to complete basic household chores and shop for groceries. Response at 12. Those circumstances may have influenced then-Chief Special Master Dorsey's pain and suffering award (although it is not specifically emphasized in her analysis). *Collado*, 2018 WL 3433352 at *6-8. While Ms. Wilcox has not described any comparable compelling circumstances, she received two additional steroid injections, and her overall duration of injury was longer – even when factoring in the treatment gap prior to her surgery.

Based on consideration of the record evidence, the above comparisons, and my overall experience with SIRVAs, I find that a fair and appropriate award for past pain and suffering in this case is **$117,500.00.**

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum of $117,500.00 (for past pain and suffering)[11] to be paid through an ACH deposit to petitioner's counsel's IOLTA account for**

---

[9] *Moore v. Sec'y of Health & Hum. Servs.*, No. 19-1850V, 2022 WL 962524 (Fed. Cl. Spec. Mstr. Feb. 25, 2022) ($115,000.00)

[10] Citing *Collado v. Sec'y of Health & Hum. Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for past pain and suffering); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2020 WL 5512534 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) ($120,000.00).

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

*/s/*__Brian H. Corcoran__
**Brian H. Corcoran**
**Chief Special Master**

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.